Our final case for argument is 23-1032 Leming v. HHS. Mr. Carpel, please proceed. Thank you, Your Honor. Good afternoon. May it please the Court. We're here because 15 months AL received an MMR vaccine, developed immune thrombocytopenic purpura, a serious disease, platelet disease. Okay, counsel, we know all of it. Okay, fine. So let's just move ahead, please. And why don't you focus on whether or not the surgery that your client experienced was a surgical intervention under the statute and tell me why we should interpret the statute in a way that is different from the way it was interpreted below. Certainly, yes, Your Honor. Well, the way it was interpreted below is that it had all the earmarks of a surgical intervention. The decision of Chief Special Master Dorsey was reversed on a distinction that's extra statutory. It's not in the statute that that surgical intervention, the key word intervention I think the key issue here is whether surgical intervention is limited to treatment or whether it could be diagnostic, which could lead to treatment, right? That's the issue. That's the issue. So why is it you're arguing I think today that surgical intervention should not be limited to treatment. Why is that? There's nothing in the statute that limits it to treatment, number one. But even if we were limited to treatment, the distinction here is not applicable under the facts. Well, just let me go back to the first issue. What are you focused on? What are you relying on to argue that surgical intervention is not limited to treatment? Is it the word intervention? Is it the surrounding words in the statute? Why don't you walk us through that statutory interpretation argument that you made? As emphasized in Wright v. HHS and in the statute, intervention is for the benefit or the improvement of health. There's no reason why even a diagnostic procedure, and this was not purely diagnostic, it was to facilitate treatment, should be limited in that way as interpreted by the court. In the court, the judge relied strictly on dictionary definitions for that distinction. There's nothing in the statute that draws a bright line distinction between treatment and diagnosis. What is it that we're trying to figure out here? The severity, right? Severity? Exactly. How does treatment versus diagnosis have anything to do with severity? We would argue no. We would argue that the severity is inherent in the nature of the intervention, the surgical intervention that the child had to undergo. There's other requirements in the statute, right? There's a six-month requirement. Surgical intervention and inpatient. Inpatient hospitalization. There's no dispute about inpatient hospitalization. It's conjunctive. You have to be inpatient and have surgical intervention, which means the hands or instruments of a surgeon have to be employed while you're inpatient. If you went in for a diagnostic that was surgical as outpatient, it wouldn't be covered. But this was inpatient. Right. I'm just saying we're trying to interpret the statute, not the facts specific in this case. Absolutely. There's no dispute about that point. So it does limit surgical intervention by the conjunctive. You have to be inpatient and have surgical intervention, and there's nothing you're arguing on the face of the statute that says that intervention has to be limited to cure as opposed to even diagnostic. I think the relevant language is improvement of health. There's no reason why a diagnostic procedure... It's for yes or no. I need to know what your response is to Judge Piancimigo's question. And if you need to articulate it again, we can articulate it again. If you could pose the question. Yeah. So I'm inpatient and a surgeon is going to intervene. Whether it's diagnostic or treatment, which are two different things. One's going to potentially cure. The other one's going to help decide what path we're going to go down. It doesn't matter. As long as I'm inpatient and a surgeon is intervening, I would fall within the scope of the statute. That's our argument. Certainly. But there's another argument, too. Even if it was a bright line distinction between diagnosis and treatment, we still would be within the meaning of the statute because this intervention was to facilitate treatment. Because the child had to go instead. So that's a fact-based. That's fact-based. Right now, for us as an appellate court, the most important thing for us to focus on is the interpretation question. Except it is relevant because Chief Special Master Dorsey found, as a matter of fact, that there was a blurred distinction. I understand. I just want to stick on this other issue for a minute, okay? Are you aware of any medical dictionary or other dictionary or other source that uses the term surgical intervention? Not other than what's cited in the record. So because what we've got is we've got an interpretation of surgical and an interpretation of intervention. Based on the dictionary. And I think everybody agrees that surgical is not limited. I mean, surgery could be for treatment and surgical could be for treatment or it could be for diagnosis, right? That's undisputed. That's undisputed. So somehow the real question here is whether the word intervention, you know, in the context of the statute, somehow limits itself to treatment and ignores diagnosis. I think that's the issue before, the legal issue before the court. Agreed. And our argument is, and the relevant language here, forgive me for repeating myself, it's for the benefit of health. So why is a diagnostic intervention that facilitates treatment not for the benefit of the health or the improvement of the health of the patient? And I suppose that if Congress intended it to be treatment, they would have said surgical treatment might be one argument. Congress did not say anything about this. As Judge Kaplan herself said, there's almost no legislative history except for Judge, Senator Jeffords' statement about interception. One senator spoke. Other than that, there's nothing in the legislative history that helps us evaluate that issue. I want to follow up on one thing, because you said yes to Judge James Emengo's question. And I want to make sure I understand, because there was a presupposition in her question, which I'm not sure is what I've seen fully flushed out here. She suggested that you have to both be inpatient hospitalization and have a surgical intervention. And I think I understood her question as tying those two things to the same moment in time or same event. And I think her question even may have suggested that therefore an outpatient surgical intervention wouldn't count. And let me ask, is that your view? Because when I read this statute, I don't see that. I see it requires inpatient hospitalization and it requires surgical intervention. And I don't see that this statute requires those two things are happening at the same time. So what if somebody went in the hospital for an inpatient hospitalization for a period of time, and then they were released and they were told to go and have an outpatient procedure? Are you saying that wouldn't count under the statute? It's a fair question. It's outside the confines of this case. We don't have that situation in this case. In this case, we have inpatient hospitalization and we have surgical and intervention. So the question of whether or not it's disjunctive or conjunctive is really not presented. Well, it's not disjunctive. Disjunctive would be the word or. This is not the word or, it's the word and. But the and could be you could have a patient that had both the hospitalization and then also had a surgery that was performed outpatient. And that would seem to me to fall within the statute. In the appropriate case, I would certainly argue that as a petitioner's attorney. I mean, I don't know the answer. And you're right, since it's not presented to us in this case, maybe we don't have to answer that question. We don't. Your view is here. You've got, for the same surgical procedure, it was an inpatient hospitalization at the time of the surgical procedure. That's right. So I don't know if there are any more questions about that component of the case. We can go on to the second issue that was in this case, a separate decision. After this court issued the right decision, it clarified for the first time what the severity provision of the Vaccine Act meant in the context of immune ITP, immune thrombocytopenia purpura. This is the big platelet argument? That's right, giant platelets. Did you say giant? Well, that's what they're called. Giant platelets, a blood smear. No, I get it. I wasn't big enough. I got it. OK. The big platelets didn't get the job done. Wright says that the key element is a somatic change within the body. And that's exactly what we have here. And it was detrimental, because as Petitioner's expert explained, that if you have giant platelets, that's a reaction to ITP. And giant platelets don't adhere to the cell wall and can cause bleeding. And what we had here is bruising. And bruising alone, clearly under Wright, is not sufficient. But here we have a somatic change within the body that's related to bruising that was identified at the same appointment where the blood smeared. I just have a question. I'm sorry. I just have a quick procedural question. I am to understand that this is an alternative basis for arguing that you want disability to be present, right? Yes. Thank you for asking that. I just wanted to make sure I understood that. It's a completely separate basis. We need to find for you on this in order to find for you on the first issue. They're independent. Oh, yes. One or the other. Because for me, my problem with this argument is that the special master in the Court of Federal Claims cited an enormous amount of evidence, position notes from November of 2016, from December of 2016. And this is an arbitrary and capricious standard. And yes, you point to three pieces of evidence. But I am not the fact finder in the first instance. And as much as I like your argument in the first issue, I kind of don't love it on this issue. Because I feel like you're asking me to step into the role of fact finder. And you're asking me to do so when, quite frankly, there are a lot of position notes. A lot, lot, lot, which they cite, which seem to contradict your point here. Well, I think Your Honor is referring to the position notes that say the condition's resolved. But those resolved medically, as we argued in our brief, is different from whether it's resolved or whether the condition is a lingering effect of the condition. That's the language. Position note December of 2016, three months post-vaccine. Patient, quote, patient continues to remain free of bleeding symptomology, no easy bruising, or, I don't know how to say that. Nice word. Petitioner, I'm not sure myself. Yeah, I'm sorry. So I mean, that would seem to suggest that a lot of the symptoms that were the result of the giant platelets no longer exist three months post-vaccine. Then, then, but in July of 2017. In December, wait, December 2016, AL is asymptomatic with normalized platelet count. Plate patient likeliness resolved at this time, and this is unlikely to reoccur. Yes, we don't dispute that record. What we are arguing is that in July of 2017, which was almost nine or 10 months after the onset, which would meet the six month severity rule, that there was something abnormal that was shown in the blood smear. A blood smear can be used to diagnose ITP. The table injury defines ITP strictly in terms of low platelet count. So wait, just to be clear, so are you, is your argument that the board or the Court of Federal Claims and the special master didn't err when they relied on all this evidence to conclude that potentially at month two and month three everything got better, but you're then saying it then later got worse again? Or is your argument that it was bad all along and they were wrong to think it was better despite the evidence? Well, I think all we have to show is that there was a lingering effect after six months. We're arguing that there was a lingering effect of the ITP after six months. That meets the definition of the severity rule. That's our argument. Isn't it, six months is somewhat arbitrary, but it's the time period they picked and at the six month time period they found, the doctors found no residual effects. At least that's what the record we have suggests. And then after that, there were, what you're arguing are residual effects. The giant platelets were present. Now, again, I think Chief Judge Moore's argument was were they present before the six months and they missed it, which we don't have any record of, or this is something that reoccurred, but now you're outside the six month window and so you're just, it's too bad, so sad, but you're past the cutoff point. Well, I understand your concern. First of all, residual effects is a legal term. So no doctor found that there was no residual effect. They found, they used the word resolved, no symptoms. After the six months, however, there were symptoms. There was a lingering effect. And whether or not there were nothing found earlier, and there weren't blood smears done every time. So when the blood smear was done in July of 2017, that's when the lingering effect was detected and there was a complaint from Ail's mother at that point of bruising. Now, bruising alone, as I mentioned earlier. We have your argument and we want to save you some rebuttal time. So let's hear from the government. Ms. Collison, did I get it right that time? Thank you. So let's jump right in, counsel, and start with the legal interpretation of the surgical intervention language. Thank you and may it please the court. Respondents still believe that distinguishing between surgical procedures that are diagnostic and for treatment, as Chief Judge Kaplan did, is a good way to ensure that Vaccine Act compensation is reserved for serious- That sounds like a purpose thing. Why is it? What about that language? Surgical intervention should not cause us to think that it's intended to be, that it's limited to treatment. I'm having a hard time seeing it. So I want to hear your best argument. Chief Judge Kaplan explained that at Appendix 18 in her Loving One decision. First, she looked to several dictionary definitions of the word intervention. In particular, she seized upon whether or not the surgical procedure affects, modifies, or prevents. And she determined- But that's a causation thing. Because obviously, if you're going to diagnose somebody with a particular thing so that you know what treatment to take, you are going to affect the injury. It's just not maybe immediate. Right. So she did several things in order to determine how to interpret surgical intervention. So she first looked at dictionary definitions. Then she also looked at what the special masters had been doing to interpret this term in their own practice. She noted that several special masters, including Special Master Dorsey-Below, had wanted to make this distinction between diagnosis and intervention. That's not a basis for a statutory interpretation, right? She took that into consideration in addition to looking at what surgical invention was intended to account for when it was added as a basis for meeting this vaccine, Section 11. It was a pretty narrow issue that came up from a vaccine thing when they added it. I mean, should we interpret this as only in that particular instance where you need surgical intervention for this intestinal stuff that results from this vaccine, which I'm sorry, I can't remember the name of it at the moment, or as it's written more broadly, just a surgeon intervenes to do something. I think it's in between the two. The vaccine program has lived with the surgical intervention now since the year 2000 and has interpreted it certainly outside the bowel resection surgery for intussusception context. But pretty uniformly, the vaccine program has interpreted that surgical interventions need to be a stand-in for the type of surgery that was contemplated there. So it needs to be a stand-in for six months of sequelae or death, which is the only two ways that you could have met the severity. Is it, how is it that treatment versus diagnosis, for example, in removal of a tumor for a brain tumor, how is it that treatment versus diagnosis somehow helps to understand whether it's severe enough, what the person has undergone? I have two parts in response to your question, Judge Stoll. First, with respect to the particular circumstances here, I think it's extremely useful. The whole context of the government's motion for review here was because bone marrow biopsy is contemplated in the QAI for ITP, so contemplated in the definition. I don't think you're answering my hypothetical. Yes, I understand your hypothetical. Could you answer that for me? Because this interpretation that we are thinking about here is not just for the facts of this case. So I'd like you to address my hypothetical and tell me what work is diagnosis versus treatment doing in my hypothetical? Why is it that it's somehow showing whether something's more or less severe? So I think it matters for, it matters very much in the distinction for this particular circumstances of this case. Bone marrow biopsy in ITP. Yes. Please address my hypothetical. With regard to the hypothetical, I believe Your Honor is referring to page 502 of Judge Tapp's opinion in Flores, who he expressed his concern that the definition, a distinction between diagnosis and treatment would leave out. It's not worrying that a lot of your argument is telling me what the different judges think, and I was curious about what the government thinks. Right. So the government's position today is with respects to the facts at hand. It is concerning for us that bone marrow biopsy, which happens in nearly all ITP cases, would serve as, would meet the severity requirement when in 1995, when ITP was added to the table, you had to satisfy six months of sequela or death in order to meet the severity requirement. And in fact, the notice of proposed rulemaking for ITP. So you're going to argue the facts to explain what my interpretation should be by ignoring the hypothetical. I'm sorry. Yes. Responding to the hypothetical, I disagree. I agree, yes. That's what I'm going to do. Responding to your hypothetical brain biopsy, I highly, in such a circumstance, it would be very unlikely that such a case that required a brain biopsy would not meet the six months of sequela. Okay. Let's try this instead. What work is distinguishing between diagnosis versus treatment doing with respect to showing how severe the experience of the surgery was? Because everybody agrees that surgery could be for treatment or diagnosis. But when you're talking, so what work is it doing to say, well, it's for treatment, so it's more severe. Well, it's for diagnosis, it's less severe. I think it's an important, it's a step, right? It's most diagnostic procedures are less severe than a surgery that- I don't know that. I'm not a doctor. And this is why, in looking at the severity requirement, I read the conjunctive is also temporally related. You're inpatient getting surgery, not you're inpatient, okay? And at some other time, you're getting some surgical intervention that's diagnostic or treatment, but maybe not rising with the level of severity because it's being done outpatient. So looking at Judge, Chief Judge Moore introduced this temporal issue on the end, which I had sort of, in my mind, saw them together in the way I read the statute because it has to be severe. And so you're in the hospital and you're having surgery. There's going to be some level of severity to that as opposed to, okay, show up at the doctor's office and get a biopsy or get some other treatment that requires some kind of surgery, but is not that severe because you're going to go home in 10 minutes. The government certainly agrees with that interpretation. And I believe that that's what has been in practice in the vaccine program since 2000. And that's in Flores as well, right? That's in Flores. Although I will say that Judge Tapp takes an even more strict reading of the statute and says, actually, the bone marrow biopsy itself in Flores, as is actually the case in Lemming, did not require inpatient hospitalization. The child was hospitalized anyway for steroid therapy. And so in Flores, the child actually would not have met the severity requirement based on surgical intervention and inpatient hospitalization. In that case, the severity requirement was met based on six months of Zikola. Okay. It's just so complicated. It's good that it's so fact-specific because if you're inpatient, not because you need the surgical intervention, but you're inpatient for treatment and there's a surgical intervention, your argument may be that that is not a level of severity that would tie them together. But you could be inpatient and need the surgery all as one thing that would then rise to the level of severity. And then it all just becomes very case- and fact-specific. And I agree. All of these decisions are very context-specific. And that's why I think this is the first time that the government has moved for review of a special master's decision interpreting the phrase because in this particular circumstance in which a bone marrow biopsy, which is very common in the case of ITP, which often resolves within six months, we saw a pattern. There had been three cases in which special masters had determined, well, it's both diagnostic and intervention. So we'll meet the severity requirement there. Do you agree that intervention can be for diagnostic or treatment purposes? That the word intervention does not dictate it has to be for treatment. It could also be diagnostic. Yes, and I think the important part would be if it's a treatment purpose, if there's a treatment element that you would meet the statutory definition is the way that I'm reading Chief Judge Kaplan's decision. I'm asking you. The word intervention is just, I'm just going to intervene and I may be intervening surgically to get a diagnosis or I might be intervening surgically to treat you. And I don't see where there's the distinction here that I would say, oh, if it was simply to help diagnose and then lead to treatment, it's not covered. That's correct. You're saying you agree that the term intervention includes both treatment and diagnosis? No, I'm agreeing that the term intervention would require something that affects, modifies or prevents the particular vaccine injury. Well, effects and modifies would might be part of a treatment diagnosis to say, okay, we're going to go down this path instead of that path. Because now we've determined something else is going on here. Okay. Yes, I mean, You're not reading the word directly, right? That's what I understand you to be doing is that when you say an intervention has to directly lead to, you know, rather than maybe something I'm sort of, yeah, rather than a two-step process. Correct. And I think that even, so Chief Judge Kaplan, I think even mentioned, She used the word directly. She used the word directly. As noted in footnote eight of Chief Judge Kaplan's lemming one decision at appendix 19, the government argued below that, you know, we believed that the special master should also be afforded the opportunity to assess whether the effect of the surgical intervention or the surgical procedure, as it was, was of the magnitude contemplated by Congress, akin to that undertaken to treat severe cases of antisusception or an equivalent stand-in, in other words, for six months of severity. So something you said earlier, I caught in my ear. And what you said was that in this case, that lemming AL, I think it's AL, was in the hospital for reasons not related to the surgical procedure. That's correct. I mean, she was in the hospital for treatment of her ITP, which included IVIG infusion. And the bone marrow biopsy was performed on October 4th in order to rule out leukemia so that they could start another treatment, which was IV steroids. And both IV steroids- Because the original treatment wasn't working, right? That's correct. And so it's your view, I don't think there's a finding on this, but that the surgical procedure that was performed wasn't requiring an inpatient hospital stay? Are you saying that's- I mean, if you look at the record, you know, the anesthesiologist says, you know, okay to discharge home, but it's not in the record here. It was not, we did not appeal on the basis of there not being a sufficient inpatient hospitalization. Okay. Without any further, thank you, counsel. Thank you. Mr. Freckle, you have a follow-up question? Thank you. Just a couple of points, and I'm happy to answer any other questions. There is nothing in the statute that says the surgical intervention needs to be directly related to the underlying condition. Although here we would argue that it was directly related, but there's nothing in the statute that says that. There's nothing in the statute that points to any kind of distinction that was drawn by the chief judge. This distinction between treatment and diagnosis is non-existent in the statute. We have to resort to dictionaries, dictionary to create a judicially created distinction that doesn't apply. So that's one point. Again, the key element for the surgical intervention, with emphasis on intervention, is improvement of health. That's exactly why the surgical intervention was done. Also, I don't think it sounds like the issue of whether or not this procedure would have required an inpatient procedure is not really in this case, although we would argue that it is a severe procedure. There was a question about the severity. It is severe. It does require general anesthesia. It is invasive. It does require informed consent. These are all the factors that Chief Special Master Dorsey focused on when she determined that this was not purely for diagnosis, although even if it was, we would argue that it still met the definition of the statute. So there's nothing else I have. I'm happy to answer any other questions that the court has. Okay, thank you, Board of Counsel. This case is taken under submission.